**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARY N. S.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 19 C 3133** |
| | ) | |
| **KILOLO KIJAKAZI, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Mary N. S. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a competing brief in support of affirming the decision. After careful review of the record and the parties' respective arguments, the Court affirms the ALJ's decision.

## BACKGROUND

Plaintiff applied for DIB on February 25, 2016, alleging disability since October 30, 2009 due to back problems/lower back pain, fibromyalgia, and a learning disability/7th grade education. (R. 233, 328). Born in February 1978, Plaintiff was 31 years old as of the alleged disability onset date, and 35 years old as of her March 31, 2013 date last

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. She is automatically substituted as the named defendant pursuant to FED. R. CIV. P. 25(d).

insured. (R. 233, 316). She lives with her husband and daughter and made it through the 6th grade in school. (R. 75-76, 329). Plaintiff worked as a housekeeper at a hospital from April 1997 to December 1999, then went to work at an automotive warehouse performing jobs such as auditor, picker, and sorter. (R. 76-78, 319, 329). On December 8, 2006, Plaintiff injured her back while lifting boxes at work. (R. 411). The injury caused her problems for the next few years, keeping her off work at various times and ultimately leading to spinal fusion surgery on October 23, 2009. (R. 717). Plaintiff quit her job shortly thereafter on October 30, 2009. (R. 328). In April 2019, Plaintiff started working again and was still employed as of at least July 28, 2020, though she claims she experienced significant pain and was able to take breaks as needed, "which is not normal." (Doc. 17, at 14; Doc. 31, at 14).

The Social Security Administration denied Plaintiff's applications initially on March 24, 2016, and again upon reconsideration on September 8, 2016. (R. 103-28). Plaintiff filed a timely request for a hearing and appeared before administrative law judge Karen Sayon (the "ALJ") on February 6, 2018. (R. 69). The ALJ heard testimony from Plaintiff, who was represented by counsel, and from vocational expert ("VE") Edward P. Steffan. (R. 69-102, 378). On May 3, 2018, the ALJ found that Plaintiff's back dysfunction is a severe impairment, but that it did not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 at any time prior to the March 31, 2013 date last insured ("DLI"). (R. 56). After reviewing the evidence, the ALJ concluded that from the October 30, 2009 alleged disability onset date through the DLI, Plaintiff retained the residual functional capacity ("RFC") to perform her past relevant work as a store laborer, inventory clerk, and hospital cleaner, and so was not disabled. (R. 56-60). The Appeals

Council denied Plaintiff's request for review (R. 1-6), leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by this Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

In support of her request for reversal or remand, Plaintiff argues that the ALJ: (1) erred in finding her capable of medium work despite contrary opinions from her treating physicians and her own subjective statements; (2) failed to properly account for her mental impairments in determining her RFC; (3) erred in relying on the VE's testimony regarding available jobs; and (4) improperly denied counsel an opportunity to give a closing argument at the hearing. For reasons discussed in this opinion, the Court finds that the ALJ's decision is supported by substantial evidence.

## **DISCUSSION**

### A. **Standard of Review**

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the Social Security Act (the "SSA"). In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

B.    **Five-Step Inquiry**

To recover disability benefits under the SSA, a claimant must establish that she is disabled within the meaning of the SSA. *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016). A claimant is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to law for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether [s]he can perform her past relevant work; and (5) whether the claimant is capable of performing any

work in the national economy." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520). If the claimant meets her burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

## C. Analysis

### 1. Physical RFC

Plaintiff argues that the case must be reversed or remanded because the ALJ erred in finding that she had a physical RFC for medium work. A claimant's RFC is the maximum work that she can perform despite any limitations. *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, at *1-2. "Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012).

The ALJ found that from October 30, 2009 through the March 31, 2013 DLI, Plaintiff was capable of performing the full range of medium work, except that she was limited to frequent as opposed to constant climbing and stooping. (R. 56). In reaching this conclusion, the ALJ gave great weight to the March 23, 2016 opinion from State agency consultant Michael Nenaber, M.D., as affirmed by Teresita Cruz, M.D. on September 6, 2016. Both physicians determined that Plaintiff could: occasionally lift and carry 50 pounds; frequently lift and carry 25 pounds; sit, stand, and walk for 6 hours in an 8-hour workday; frequently climb ramps, stairs, ladders, ropes, and scaffolds; frequently stoop; and push, pull, balance, kneel, crouch, and crawl without limitation. (R. 110-11, 123-24). Plaintiff objects that neither physician examined her (Doc. 17, at 5; Doc. 31, at 4), but it

is well-established that ALJs may rely on opinions from State agency consultants, who are "highly qualified and experts in Social Security evaluation." *Elizabeth A. D. v. Saul*, No. 19 C 6024, 2021 WL 148831, at *10 (N.D. Ill. Jan 15, 2021) (citing *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004)).

Plaintiff argues that the ALJ still should have given more weight to the opinions from her treating physicians, two of whom stated that she was not capable of performing more than light work, and one of whom indicated she needed to continue off work for some period of time. (Doc. 17, at 5-6, 11-12). A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); see *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). If the opinion is contradicted by other evidence or is internally inconsistent, the ALJ may discount it so long as she provides an adequate explanation for doing so. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). That is to say, the ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ. 20 C.F.R. § 404.1527(c)(2)-(6); see *Simila*, 573 F.3d at 515.

On October 7, 2010, physical therapist Rob Larkins completed a Functional Capacity Evaluation ("FCE") indicating that Plaintiff could: occasionally stand, walk, and sit (meaning up to 1/3 of the day); occasionally lift and carry up to 20 pounds; occasionally push and pull up to 20 pounds; and occasionally stoop, crouch, and twist. (R. 1225-26). Based on that FCE, neurosurgeon Douglas L. Johnson, M.D. opined on October 14, 2010 that Plaintiff could return to work at a sedentary or light duty level. (R. 1348). A year later on December 12, 2011, pain management specialist Narayan (Bob) S. Tata, M.D. indicated in a treatment note that Plaintiff was to continue off work. (R. 1401).

The ALJ considered all of these opinions but found them inconsistent with records showing improvement with physical therapy ("PT"), minimal treatment, normal neurological findings, and stable imaging. (R. 58-59). The Court finds no error in this conclusion. Plaintiff started treating with Dr. Johnson in October 2008, a year before the October 30, 2009 alleged disability onset date. She complained at that time of back pain shooting down her right leg, muscle spasms in the middle of her back, pain in both hips, and intermittent numbness in the right thigh stemming from her December 8, 2006 workplace injury. (R. 1120). Dr. Johnson recommended PT and referred Plaintiff for sacroiliac ("SI") joint injections, which Dr. Tata administered on November 11, 2008. (R. 642, 1122, 1195). When these and other conservative measures such as TLSO (thoracic lumbar sacral orthosis) bracing failed to resolve Plaintiff's back pain, Dr. Johnson performed an anterior lumbar fusion on October 19, 2009. (R. 57, 716-17, 787-88, 790). By December 3, 2009, Plaintiff was feeling much better and Dr. Johnson assessed her condition as "controlled, stable, [and] improved" with "no evidence of recurrence." (R.

1077-78). A January 25, 2010 x-ray of the lumbar spine showed interval surgery at L4-L5 and L5-S1, scoliosis, and Schmorl's nodes.[2] (R. 895).

Over the next 10 months, Plaintiff attended more than 40 PT sessions. Her pain was generally at a low level of 1-2/10 but sometimes rose to 4/10. (R. 57, 916, 917, 919, 921, 924, 932, 1269, 1272, 1273, 1275, 1280-92, 1294-1303, 1305-09). On March 30, 2010, Dr. Johnson released Plaintiff to return to light duty work. (R. 1030). By June 1, 2010, she was ready for work conditioning with Rob Larkins, P.T. (R. 57, 936, 940). After 12 sessions from June 1 to 28, 2010, Plaintiff was still reporting pain of 3-4/10 with forward bending and deep squatting, but "demonstrate[d] fairly good tolerance to walking, lifting, and carrying as long as she is not required to lift and carry in excess of approximately 10-15 lbs." (R. 924). Mr. Larkins concluded that Plaintiff remained capable of sedentary to light work with no lifting off the floor. (*Id*.).

When Plaintiff returned to Dr. Johnson on June 29, 2010, she continued to complain of lower back pain radiating bilaterally into the hips and buttocks. The pain worsened with repetitive movement but was alleviated down to a level of 2/10 with Naproxen. (R. 1024). On exam, Plaintiff had normal gait and station; moderate tenderness in the spine at L4 and L5; and moderate to severe tenderness in the SI joint bilaterally. Dr. Johnson prescribed a TLSO brace and more PT, and instructed Plaintiff to stay off work for 6 weeks. (R. 1025).

In July and August 2010, Plaintiff reported ongoing lower back pain at a level of 1-3/10 and exhibited difficulty bending and lifting. (R. 917, 919, 921). On August 19, 2010,

---

[2]     A Schmorl's node is a spinal disc protrusion common in the middle and lower spine that usually causes no symptoms but reflects wear and tear of the spine occurring over time. (http://www.medicinenet.com/schmorls_node/definition.htm, last visited November 24, 2021).

Plaintiff told Dr. Johnson that she had constant pain of 4/10 above the fusion level. Though Naproxen helped, she also complained of pain in the bilateral hips that kept her awake at night because of her need to constantly shift positions. Plaintiff further reported a burning sensation down both legs occasionally radiating to the left big toe. (R. 988). Dr. Johnson recommended additional PT since Plaintiff said it was helping. (R. 988-89). By October 1, 2010, Plaintiff had plateaued in PT so Dr. Johnson asked Mr. Larkins to conduct an FCE. (R. 1346). Based in part on that October 7, 2010 report limiting Plaintiff to occasional sitting, standing, and walking, and occasional lifting and carrying of up to 20 pounds, Dr. Johnson opined on October 14, 2010 that Plaintiff could work at both the light and sedentary levels with vocational training. (R. 58, 1225-26, 1348).

The ALJ gave Mr. Larkins' FCE, and Dr. Johnson's related October 14, 2010 opinion, only some weight because neither reflected Plaintiff's progress and treatment history from 2011 through the March 31, 2013 DLI.[3] (R. 58). For example, Plaintiff received no further treatment for more than six months from October 2010 until April 28, 2011. (*Id*.). Plaintiff explains that she was trying to find work during that period (Doc. 17, at 5), but she does not claim she was unable to access or afford treatment while she looked. In fact, once the back pain returned in April 2011, Plaintiff phoned Dr. Johnson's office to complain. (R. 58, 1349). Dr. Johnson then sent Plaintiff for a CT scan of the lumbar spine. (R. 1350). That May 16, 2011 test showed post-surgical changes from the

---

[3]    Plaintiff objects that the ALJ improperly discounted Dr. Johnson's opinion on the grounds that it was "largely based on one evaluation" (Doc. 31, at 10), but this reflects a misreading of the record. The ALJ found it significant that the evaluation in question (the FCE) was "from 2010," meaning it did not encompass more than two years of additional evidence through the March 31, 2013 DLI. (R. 58-59). Since the same is true of the FCE, the case need not be remanded merely because the ALJ incorrectly stated that the FCE was based on only one examination when, in fact, Mr. Larkins worked with Plaintiff several times, as did his colleague Ken Olson, PT. (R. 58).

fusion, but anatomic alignment with no significant central compromise or acute complication demonstrated. There was also evidence of mild spondylosis without significant central canal or foraminal narrowing, and 2mm retrolisthesis at L3-L4. (R. 58, 1357).

At an appointment with Dr. Johnson on May 26, 2011, Plaintiff reported low back pain radiating down both legs averaging a level of 6/10. After sitting for five minutes, she experienced a burning sensation in the mid portion of her low back, and could only walk 3 to 4 blocks before needing to rest for 5 minutes. (R. 1352). On exam, however, Plaintiff exhibited full muscle strength and was able to heel and toe walk without difficulty. A straight leg raise test did elicit back pain so Dr. Johnson advised Plaintiff to restart PT, get an MRI of the lumbar spine, and see Dr. Tata for further pain management. (R. 58, 1353). There is no evidence Plaintiff pursued PT as recommended, but the June 7, 2011 MRI showed postoperative changes at L4-L5 and L5-S1; minimal residual central protrusion without nerve root impingement at L5-S1; and endplate Schmorl's nodes at T11-T12 through L3-L4. (R. 58, 1355, 1395).

The following month, on July 14, 2011, Dr. Tata administered transforaminal steroid injections at L4-L5 and L5-S1. (R. 1358). He repeated the injections on November 17, 2011. (R. 1402). Plaintiff last saw Dr. Tata on December 12, 2011. The treatment note is largely illegible but it appears Dr. Tata indicated that Plaintiff was to continue off work for some unspecified period of time. (R. 59, 1401). The ALJ gave this note little weight because it was inconsistent with the overall record showing stable imaging studies and was unsupported by a function-by-function assessment. (R. 59). Significantly, Plaintiff did not seek further back treatment from Dr. Tata or anyone else after December

2011, more than a year before the March 31, 2013 DLI. And while Plaintiff needed care for kidney stones in early 2013 (R. 1536), she had no more complaints of musculoskeletal pain until January 26, 2015, nearly two years after the DLI. On that date, Plaintiff slipped on the ice, hit her head on the ground, and hurt her neck in an acute injury, leading to another round of PT. (R. 1475).

Plaintiff does not address most of this treatment history or explain how it demonstrates that she was incapable of performing medium work throughout the relevant period. Instead she relies on her own testimony that she was suffering from disabling pain. The regulations describe a two-step process for evaluating a claimant's own description of her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2. If there is such an impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id*. In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, . . . and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The Court is to give the ALJ's assessment of a claimant's subjective symptom allegations "special deference and will overturn it only if it is patently wrong," i.e., if it "lacks any explanation or support." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (internal quotations omitted); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). A

reviewing court should rarely disturb a subjective symptom assessment, as it lacks "the opportunity to observe the claimant testifying." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). The claimant bears the burden of showing that an ALJ's subjective symptom evaluation is "patently wrong." *See Horr v. Berryhill*, 743 F. App'x 16, 20 (7th Cir. 2018).

Plaintiff testified that during the relevant period, she experienced constant back and leg pain at a level of 6-8/10 consisting of tingling and burning. (R. 79-80). She regularly used a heating pad to help alleviate her symptoms and sometimes took Norco, but she also relied on ibuprofen, Aleve, and Lyrica due to a fear of addiction. (R. 81-82, 85). As far as activities, Plaintiff testified that could only sit for 15 to 20 minutes at a time, though she also said that she could drive for 30 to 35 minutes before needing to stop briefly to stretch. (R. 75, 80). Plaintiff reported that she was able to stand for 15 to 20 minutes, walk 2 to 3 blocks, and lift and carry a gallon of milk. (R. 80). She did some light duty house cleaning such as picking up items, straightening, and minimal dusting, but it would knock her out for 2 or 3 days. As a result, she mostly relied on her husband to do the housework, and her daughter helped carry the laundry. (R. 82, 84-85). Plaintiff spent up to half of each day laying on the couch with the heating pad and watching television. (R. 83). During the night, she had a hard time finding a good position to sleep so she was constantly up and down. (R. 83, 84).

Plaintiff first argues that in discounting these statements, the ALJ applied the wrong legal standard. (Doc. 17, at 10). Specifically, the ALJ began by reciting the following boilerplate language: Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this

decision." (R. 58). The Court agrees that such boilerplate is meaningless, but it is also "innocuous when, as here, the language is followed by an explanation for rejecting the claimant's testimony." *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013). *See also Dawn P. v. Berryhill*, No. 17 C 4707, 2019 WL 339603, at *4 (N.D. Ill. Jan. 28, 2019) (use of "not entirely consistent" boilerplate language does not alone warrant reversal if "the ALJ proceeded to give reasons explaining her ultimate finding."); *Minnick v. Colvin*, 775 F.3d 929, 926 (7th Cir. 2015) ("*By itself*," boilerplate language "fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible.") (emphasis added); *Esther C. v. Berryhill*, No. 18 C 407, 2019 WL 1254888, at *2 (N.D. Ill. Mar. 19, 2019) (quoting *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014)) (same boilerplate language "not fatal if it is accompanied by 'a detailed explanation of the evidence and [the ALJ's] reasoning about credibility.'").

Turning to the substantive analysis, the ALJ determined that Plaintiff's complaints of disabling pain were not supported by the objective evidence, which showed stable imaging studies. (R. 58). In addition, after the October 30, 2009 alleged disability onset date, Plaintiff received only conservative treatment such as PT and TLSO bracing. Notably, multiple records document Plaintiff's improvement with PT. (*Id*.). Throughout 2010, Plaintiff's back pain was routinely at a very low level of 1-2/10, not 6-8/10 as she now claims. Though her pain was higher in 2011, there is no evidence that she pursued more PT as recommended. And after undergoing two rounds of steroid injections in late 2011, Plaintiff received no further musculoskeletal pain treatment until 3 years later in January 2015 following an acute injury. (*Id*.) (noting the "limited treatment records during

the period at issue.").  Plaintiff fails to acknowledge this lack of treatment and makes no claim that she was unable to afford medical care or had some other reason for not pursuing further treatment.  As noted, she states only that she was looking for work between October 2010 and April 2011.  *See Craft*, 539 F.3d at 679 ("In assessing credibility, infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment."); *Brenda L. v. Saul*, 392 F. Supp. 3d 858, 870 (N.D. Ill. 2019).

Some of the other reasons the ALJ gave for discounting Plaintiff's testimony are less compelling.  For example, the ALJ found it significant that Plaintiff was able to drive and perform some household chores (R. 58), but she did not acknowledge Plaintiff's testimony that she could only drive for short periods before needing to stop briefly and stretch, and that her husband and daughter did most of the household work.  Regardless, an ALJ's credibility assessment "need not be perfect; it just can't be patently wrong." *Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 (N.D. Ill. Apr. 10, 2014) (citing *Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013)).  And "[a]s the Supreme Court observed fairly recently, substantial evidence is not a high standard, and requires only evidence that 'a reasonable mind might accept as adequate.'"  *Richard C. v. Saul*, No. 19 C 50013, 2020 WL 1139244, at *5 (N.D. Ill. Mar. 9, 2020) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)).  Here, the ALJ provided enough valid reasons for discounting Plaintiff's complaints of disabling pain.

Viewing the record as a whole, the ALJ did not commit reversible error by giving great weight to the State agency opinions that Plaintiff was capable of medium work prior to the March 31, 2013 DLI, or rejecting Plaintiff's testimony that her pain caused disabling

limitations throughout the relevant period. Plaintiff's request to remand the case for further consideration of these issues is denied.

### 2. Mental RFC

Plaintiff next challenges the ALJ's determination that she did not suffer from any disabling mental impairments prior to the March 31, 2013 DLI despite her learning disorder. (Doc. 17, at 6-7.) The flaw in this argument is that not a single physician of record suggested Plaintiff had any mental limitations. On March 16, 2016, State agency consultant Joseph Mehr, Ph.D. found that Plaintiff did not have a medically determinable mental impairment. (R. 109.) On reconsideration on August 25, 2016, Lambros Chrones, M.D., acknowledged Field Office observations that Plaintiff had difficulty understanding and answering questions and a very poor memory. (R. 122.) He also discussed school records showing Plaintiff had to repeat the 6th grade and received multiple "Fs" on her report cards. (*Id*.). Nevertheless, Dr. Chrones affirmed Dr. Mehr's conclusion, noting that Plaintiff had not received any mental health treatment prior to the DLI and achieved mostly average scores on school testing. (R. 122-23.) The ALJ gave these opinions great weight because they were "consistent with the lack of treatment records pertaining to mental health symptomology," and because Plaintiff's own testimony focused primarily on her physical limitations. (R. 56).

Plaintiff does not cite any contrary opinions in the record, or point to any physician who imposed mental restrictions on her ability to work. She argues only that it was inconsistent for the State agency consultants to find that she had a severe learning disorder and list it as one of her 3 medically determinable impairments (R. 108-09, 121), but then conclude that she did not have a medically determinable mental impairment

during the relevant period. (Doc. 31, at 6-7). This argument fails because the listed impairments are simply those alleged by Plaintiff, not those from which she actually suffers. (R. 103, 115, 328). Indeed, fibromyalgia is also mentioned in the list since Plaintiff identified that as another of her alleged impairments (R. 328), but there is no medical evidence suggesting she has ever been diagnosed with that condition, and she does not raise any related arguments in her briefs.

Plaintiff also speculates that her severe learning disorder *could* affect her ability to concentrate, focus, understand instructions, and carry out orders. (Doc. 17, at 6, 11). Absent any supporting medical evidence to that effect, however, such speculation is not a sufficient basis to reverse the ALJ's decision. *Stewart v. Berryhill*, 731 F. App'x 509, 510 (7th Cir. 2018) ("Unsubstantiated claims are of course, no substitute for evidence.") (internal quotations omitted). And since Plaintiff does not identify any specific mental health records the ALJ failed to obtain or consider, there is no merit to her suggestion that the ALJ "should have more fully developed the record" concerning her mental functioning. (Doc. 17, at 11). *See Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017) ("Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand."); *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009).

Viewing the record as a whole, substantial evidence supports the ALJ's conclusion that Plaintiff did not suffer from a severe mental impairment or have any related limitations prior to the March 31, 2013 DLI. The case need not be remanded for further evaluation of this issue.

### 3.    Vocamotive Report

Plaintiff next claims that the ALJ erred in adopting the VE's testimony that she was capable of performing her past work as a store laborer, inventory clerk, and hospital cleaner.  In Plaintiff's view, the ALJ should have found that there were no jobs available to her as stated in an April 8, 2014 vocational assessment prepared by Kari Stafseth, C.R.C., of disability consulting services provider Vocamotive.  It appears that Plaintiff's former employer asked Vocamotive to analyze her ability to work in connection with a Workers' Compensation claim.  (R. 1429).  Ms. Stafseth concluded that "secondary to [Plaintiff's] geography, lack of transferable skills, less than limited level of education and need to alternate positions, she does not have access to a stable, gainful labor market." (R. 1437).  Plaintiff argues the ALJ committed reversible error by failing to discuss this report in her decision or give it significant weight.  (Doc. 17, at 7, 9; Doc. 31, at 6, 7-8).

To begin, contrary to Plaintiff's assertion, the ALJ did specifically cite the Vocamotive report as one piece of evidence among many that received little weight because it addressed Plaintiff's functioning after the March 31, 2013 DLI (Ms. Stafseth interviewed Plaintiff on October 25, 2013, more than 7 months after the DLI, issued her report more than a year after the DLI, and opined as to "the prospective employability, placement and wage earning potential of [Plaintiff] at this time [April 8, 2014].").  (R. 57, 1434).

Plaintiff disagrees that the report falls outside the relevant period, noting that Ms. Stafseth relied on some evidence dated prior to the DLI.  (Doc. 17, at 9; Doc. 31, at 6). Regardless, Ms. Stafseth assumed that Plaintiff had an RFC for no more than sedentary or light work as stated by Mr. Larkins and Dr. Johnson in 2010.  (R. 1435).  She also

speculated that Plaintiff "may have difficulties reading and comprehending textual material used in training programs." (*Id.*). For the reasons stated previously, however, the ALJ reasonably accepted the State agency consultants' opinions that through the March 31, 2013 DLI, Plaintiff retained the RFC for medium work with no established mental limitations. The VE testified that a person with Plaintiff's background and an RFC for medium work could perform all three of her past jobs, which is exactly what the ALJ found. (R. 59-60, 91-92). The Court sees no error in this analysis. 20 C.F.R. § 404.1566(d) (taking administrative notice of vocational experts as reliable sources of job information); *Philip v. Comm'r of Soc. Sec.*, No. 4:19-CV-04027-SLD-JEH, 2020 WL 5579839, at *5 (C.D. Ill. July 13, 2020) (citing *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)) ("Both the hypothetical questions posed to the VE and the ALJ's RFC assessment must incorporate only those limitations supported by the medical record.").[4]

It is also worth noting that Plaintiff was represented by counsel at the hearing, but she did not challenge the VE's qualifications or question him regarding the Vocamotive report. Plaintiff may have preferred that the ALJ weigh the evidence differently, but that is not a basis to remand the case. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) ("We do not reweigh the evidence or substitute our own judgment for that of the ALJ."). Viewing the evidence as a whole, the ALJ did not commit reversible error by accepting the VE's testimony that Plaintiff was capable of performing her past work from the alleged

---

[4]      In light of this finding, there is no merit to Plaintiff's unsupported objection that the State agency consultants did not themselves consider her ability to do her past work. (Doc. 31, at 7, 9) (citing R. 111, 126). The consultants in no way suggested Plaintiff could *not* do her past work, and the VE testimony on that point is supported by substantial evidence.

disability onset date through the DLI.[5]  Plaintiff's request to remand the case for further consideration of her vocational ability is denied.

### 4.    Closing Argument

Plaintiff finally seeks to have the case reversed because the ALJ violated due process by not allowing her attorney to make a closing argument at the administrative hearing.  (Doc. 17, at 12-14; Doc. 31, at 13-14).  In support Plaintiff directs the Court to the Social Security Administration's Hearings, Appeals, and Litigation Manual ("HALLEX"), which states:

> During a hearing, an ALJ will provide the claimant and appointed representative, if any, reasonable time to present oral argument.  Absent special circumstances, the ALJ will not fix a time limit on oral argument prior to the presentation of arguments.  The ALJ will ensure all oral arguments are recorded and made a part of the record.
>
> After all hearing testimony has been presented, the ALJ will:
>
> - Offer the claimant and appointed representative, if any, the opportunity to make a final oral argument at the hearing; and
>
> - If necessary, address assertions made during final oral argument by the claimant or appointed representative, if any, if the argument varies sharply with the evidence of record or if the argument raises new and relevant issues.

HALLEX § I-2-6-76, https://www.ssa.gov/OP_Home/hallex-I-02/I-2-6-76.html, last visited November 24, 2021).

---

[5]    Even if Plaintiff were correct that the ALJ should have given great or controlling weight to the opinions from Mr. Larkins and Dr. Johnson (that Plaintiff could do sedentary and light work), any error the ALJ may have made in that regard was harmless.  This is because the VE testified that a person with Plaintiff's background who was limited to light work could perform a significant number of jobs available in the national economy such as office helper, machine tender, or cleaner housekeeping.  (R. 93-95).  *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time.").

Contrary to Plaintiff's suggestion, the HALLEX "is designated as a guide rather than a regulation." *Dean v. Colvin*, 585 F. App'x 904, 905 (7th Cir. 2014). The Seventh Circuit has not yet addressed the issue, and "[c]ircuits are split over whether the HALLEX creates enforceable rights." *Davenport v. Astrue*, 417 F. App'x 544, 547 (7th Cir. 2011) (collecting cases) (discussing circuit split but not deciding the issue). But "[t]he majority hold that HALLEX guidelines do not create any enforceable rights." *Dardon v. Colvin*, No. 12 C 50398, 2015 WL 1915606, at *5 (N.D. Ill. Apr. 27, 2015) (comparing *Lockwood v. Comm'r Soc. Sec. Admin.*, 616 F.3d 1068, 1072 (9th Cir. 2010) ("HALLEX does not impose judicially enforceable duties on either the ALJ or this court."); *Ferriell v. Comm'r of Soc. Sec.*, 614 F.3d 611, 618 n.4 (6th Cir. 2010) (same); *Power v. Barnhart*, 292 F.3d 781, 785-86 (D.C. Cir. 2002) (same); *DeChirico v. Callahan*, 134 F.3d 1177, 1184 (2d Cir. 1998) (same) with *Shave v. Apfel*, 238 F.3d 592, 596-97 (5th Cir. 2001) ("This Circuit has expressed a strong preference for requiring the social security administration to follow its own internal procedures."). *See also Mitchell v. Berryhill*, No. 17 C 6241, 2019 WL 426149, at *8 n.7 (N.D. Ill. Feb. 4, 2019) ("[A]n ALJ's failure to follow instructions in the HALLEX does not show reversible error.").

Moreover, "no circuit has held that the HALLEX creates *constitutional* rights because, of course, only the Constitution, not an agency's rules or procedures, is the source of such rights." *Davenport*, 417 F. App'x at 547-48 (emphasis in original). Plaintiff does not cite a single case that was remanded to allow for an oral argument, and the arguments she wanted to raise have all been addressed on appeal. (Doc. 17, at 13-14) (stating counsel would have argued that the State agency opinions were entitled to little weight and the opinions from Dr. Johnson and Dr. Tata were entitled to great weight).

Plaintiff's request to remand the case to allow her attorney make a closing argument is denied.

## **CONCLUSION**

For the reasons stated above, Plaintiff's request to reverse or remand the ALJ's decision is denied, and the Commissioner's request to affirm the decision is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated:  November 24, 2021

_____

SHEILA FINNEGAN
United States Magistrate Judge